Good morning. May it please the Court, I am Daniel P. Schack. I'm an Assistant Arizona Attorney General. I'm here on behalf of Officer Gamblin. It seems to me the key question here was the first question that Judge Graber raised in the previous case, Smith v. Cruz, and that is, if the defendant in a 1983 action under the Eighth Amendment is unaware of the circumstances that gave rise to the attack, can that defendant be held liable for cruel and unusual punishment and delivered indifference? And that's what we have in this case here. We have to remember that the attack on inmate Lucero occurred in the Tucson prison. That was months after Officer Gamblin's interactions with the inmate in a totally separate prison. Remember Officer Gamblin? So there's no dispute here that the officer knew what had happened. The officer knew of the existing threat from the A.B., the Aryan Brotherhood. Yes. And knew that he was concerned. He was concerned, and he was in SMU 1, which is the Supermax prison. The attack didn't happen in SMU 1. It happened in the Tucson prison under when other people moved inmate Lucero to a general population yard where he wasn't protected. It is not disputed that Officer Gamblin was not involved in that transfer, did not know that it had happened, and did not know that any measures had not been taken to protect him. Go ahead, please. Is there any evidence as to whether the plaintiff, I guess it's Palmer, I want to make sure, whether the inmate objected in any way to the transfer? Is there evidence one way or the other on that? My recollection is that there is not. I don't know that there is any evidence one way or the other. What we do know is that he did not, upon being informed that he was being transferred, he did not at that point, and being transferred to a less secure yard, did not seek protective segregation at that point. But again, Would that be considered an intervening cause under our case law? Well, I don't think we need to get to intervening cause, because what it does is it takes it out of the realm of Farmer v. Brennan. Remember, the standard under Farmer v. Brennan is that the defendant in an Eighth Amendment claim must be aware of the facts that give rise to the inmate. Now, I understand you wouldn't even get that far, but if we got that far, would that, under our case law, would that sort of, if you will, acquiescence or lack of alerting the powers that be, be considered an intervening cause, if we got that far? I am not aware of any discussion of that in the Eighth Amendment context. It would certainly come up in the negligence claim, which the plaintiffs still have going against the State of Arizona for the transfer. But I'm not aware of any Eighth Amendment case. I'm not saying there isn't. I'm just not aware, especially since it wouldn't be necessary. Yeah. Here's one thing that troubles me about this case. Apparently, Mr. Gamblin, after he interviewed Lucero and learned from Lucero, because this is part of his job, he's trying to figure out, okay, about this Wortham guy that got killed, what do you know, he writes in his report that Lucero says, well, I refuse to kill him, which means that I'm now on their hit list. And he writes that up in his little report. Yes. Well, we have two copies of that report in the record. One of them doesn't have any boxes that say forwarded, da, da, da, and the other one has little boxes checked. And there's some evidence in the record that the second version that has boxes checked that it was forwarded, that really wasn't forwarded until basically the date of his death, which suggests, then, that that second forwarding was, in a sense, fraudulent, because while the report existed, maybe it wasn't forwarded at all. We also have in the record, at least it seems to me, a statement that there was nothing in his, what do they call it, IR, information report, that it was forwarded to the new prison, any information that said that he was in danger from the Aryan nation. Now, if it's true, and I say this as an if, if it's true that Gamblin wrote this report and deliberately failed to forward it so that it made it into his file, and the absence of that report in his file leads to the transfer, then what? Assuming all those, obviously, exactly. I preceded it by an if, right? Yeah. Right. That would not constitute an Eighth Amendment case. That would be negligence. No, I said he deliberately did not put it into the file, did not forward it for the file. But we must remember that the Eighth Amendment standard says that the prison official must be aware of the plaintiff being in, currently in, circumstances that create a substantial question of serious risk. In that case, in the one you hypothesized, which is pretty much what the plaintiffs have argued, that would lead to a possibility of a future transfer, a possibility of a future transfer to a less secure prison, a possibility of a future transfer to a less secure prison in which the inmate didn't say, wait a minute, I shouldn't be put in GP. All of those are factors that sound like a negligence case. They don't sound like Eighth Amendment, because those are looking to possibilities the possibility that there might at some point in the future, in different circumstances. I'm not sure there would be a negligence case. It might be an attenuation of causal consequence, but I'm positing that he deliberately didn't send it to the file. And I'll even posit further, but this is an if. I mean, it's not a fact. He did it because of hostility to Lucero. And there's some evidence, if believed and taken pretty far along, that there's hostility. He says to his — he's right, I guess it's right to his parents, maybe it's to his mom, that Gamblin has said, back off, tell your family to leave me alone. I mean, if the jury were to conclude that this was a deliberate act by Gamblin not to get it into his file, and deliberate because of hostility, then we don't have negligence. We may have attenuation of causation, but I don't think we've got negligence. Well, the bottom line is that we don't have an Eighth Amendment claim in that case, because of the case. Well, we certainly have deliberate indifference, but we may not have the causal connection. Correct. Absolutely, Your Honor. And that's the point that the Supreme Court made in Farmer v. Brennan, is that the officer is responsible for the circumstances that face him when, you know, at the pertinent time. And in this case, not only do we have a super safe prison in which Lucero is being held — Do we know why he was being held there? It might be in the record. I'm not sure, Your Honor. I do know that — Was he — was he — had he been placed there for an extended period of time? Was he like in the — what do you call it? Administrative segregation? He — I don't know. I do not know if that's why he got to SMU I in the first place. I do know that while at SMU, he did — a couple of months before Gamblin got involved, he said, oh, there's a couple of guys around me that are threatening me, and they moved him to a different run and separated him from the threat. But I don't know — but I'm not sure that the record reflects why he was sent to SMU. Once you're in this particular unit, does the prisoner come up for a regular review about being transferred out? I'm not sure that that's in the record. I do — well, actually, each — each inmate is reclassed, I think, every six months. So — and at that point, I believe the record does reflect that he was a level 5 — 5 inmate, which is the highest risk for inmates, and that's what gets you sent to these higher security units. Well, was he going to be there for an extended period of time? He had been there for several months, Your Honor. I don't know. I'm sorry. I don't know exactly when he got there. And when — when Gamblin learned of the problems with — that Locero was having with the Aryan Brotherhood, did he have any obligation under prison policy to — to alert or to make a recommendation about protective custody? Well, there are two things on that. Number one, he did make his report about the threat, and he sent that to his sergeant. He did what he was supposed to. That's — that's the one difference from the previous hypothetical. There has been an argument made that he should have sent — should have started the DI-67 process, which is the protective segregation process. The first step in that process is to isolate the inmate to make sure that he's safe from any threat or danger. He was safe. He was in a single-bunked cell with controlled movement. That's the way SMU works. So he was not — it wouldn't make sense to change anything since he was in a — in as safe — Well, is that — is that the — is that always the option for protective custody? Protective — Or for protective segregation? Protective segregation. Actually, the DI-67 process actually sends them into protective segregation units where they are housed — there's the possibility of being housed in a — in a double-bunked unit and there's more freedom of movement. Ironically, in this case, moving him under DI-67 would have made him less safe than he was already in — in SMU-1. If he — if he were subjected to that process, though, would they have — would there have been a higher obligation or a different obligation in — in checking or taking precautionary steps before transferring him to any other location? If the process were followed, then persons higher up than Officer Gamblin would have been required to — to make reports that got into the Prisoner's Aims file that would — would hopefully secure him from being transferred into dangerous situations. Given the — the procedures that we have in the record, there's the protective segregation policies that — that are in the record, and — and did this specific defendant have any authority to do more, given the level at which he was employed? Beyond reporting it to his supervisor, could he have done more? Was he authorized to do more? No. The short answer is no, Your Honor. He — he — he was there. He was told to investigate — to interview Inmate Lucero. He was part of the SSU, the investigation unit. It's a gang investigation unit. And he — what he was supposed to do was to submit his report to the sergeant, and he did that. Now, how do we know that he submitted it to the sergeant? That's the undisputed evidence in the record. He said he did. The — the facts that you alluded to earlier about whether it made it on beyond that, those are things that are — that were not his responsibility. Once — the evidence in the record establishes that once he submits the report to his sergeant — Yes. Is that Carlson? Carlson is the sergeant, yes, Your Honor. I would like to reserve the remaining time, unless you have other questions at this time. You may do that. Thank you. Thank you. May it please the Court, my name is Melinda Sloma, and I represent the plaintiff's appellees who are the survivors of Timothy Lucero. It is the appellee's position in this matter that Lucero turning state's evidence in providing critical information regarding the Aryan Brotherhood, which was known to Officer Gamblin, is exactly the circumstance that the Eighth Amendment seeks to protect an inmate on inmate violent cases. In the briefing, appellant's argument primarily rests on the issue that the risk to Lucero while he was housed at SMU1 was hypothetical. That is not the case here. First of all — Well, he wasn't killed there. That is correct, Your Honor. Okay. So when — what is your response to the question whether there's any evidence of this defendant's authority beyond reporting the threat to his supervisor? Your Honor, under the protective segregation process, any official at the Arizona Department of Corrections who becomes aware of a threat is obligated to report it and isolate the inmate. Okay. Well, he did the reporting, and so is that the extent of his authority or obligation? Your Honor, I need to first address what kind of reporting he did, because that's very important to this matter. He did an information — information report in regards to validation for a security threat group. That is a totally distinct process to protective segregation. It is. I know it is. But did he report that Lucero was under threat? What he reported in his conclusion was that Lucero self-reported — I think the title of the report was simply self-admission. It didn't say anything about an inmate threat and the title of the report. And he said at the bottom, five points towards validation. Now, as a security threat group officer, Gamblin knew that this report could sit in the file and just stay at the prison and go nowhere else. Who made the decision to transfer to Tucson? The decision was made, I believe, by somebody up higher in the chain of command. I'm not sure if it would have been the deputy warden or the warden. And it's Apelli's position, Your Honor, in this case, that even if the court were to assume that Gamblin did the correct process when he interviewed Lucero, which it's Apelli's position that he did not because he didn't start the protective segregation process to flag that Lucero was under risk, that when he went to the recorded and sworn interview with the Yuma County attorneys, his obligation pursuant to the Arizona administrative orders was again triggered. Again, he failed and he did not initiate the protective segregation process. Now, as far as the court being concerned about the risk being attenuated, what we would get at if the protective segregation process had been started by Gamblin and later Lucero was not put in protective segregation, then we would acknowledge and concede that Gamblin didn't have any responsibility and he didn't ignore substantial risk of serious harm. However, that's not what occurred here. Did Lucero, does the record show one way or the other whether he objected to the transfer or whether he asked for any extra protection at that time? What the record shows, Your Honor, is evidence that Lucero had written letters to his family and there was recorded telephone conversations by the Department of Corrections where he stated to, I believe it was his mother, and it was as late as May, right before he was transferred, I don't understand how this happened. It went from me having a hit on me to me being a brother. What is up with that? And as far as Gamblin ignoring a substantial risk of serious harm, SMU-1 was not the super secure facility, the best place that Lucero could have been. Well, that seems irrelevant to me. I'm speaking only for myself because he wasn't harmed there. Had he stayed there, he'd probably still be alive. But it would just be guessing to think that he wouldn't. So whether it was the very best place for him to be, it was at least safe while he was there. And, Your Honor, the reason why I address that is because that is really elucidated by the appellants where they say that Lucero under SMU-1 was in the safest, super secure place he could have been. Gamblin didn't have any knowledge that he was going to be transferred. And that is precisely the point if the court takes that as true. Because Gamblin didn't do anything further and he was saying it was a hypothetical risk, an officer can't be held responsible for a hypothetical risk. Well, if he had no knowledge of the transfer, there has to be some other basis on which you can hold him personally liable. And so what specifically is your theory, since he wasn't responsible for the transfer and apparently didn't even know about the transfer? The theory is, Your Honor, it started with Gamblin, because he was present in the He did. He notified his supervisor by means of that report that the Aryan Brotherhood had threatened to kill him or give him the same fate as the other guy. But it wasn't the proper type of report, first of all. Second of all, in regards to the protective segregation packet, that should have been started after the recorded interview. And that would have been notated in Lucero's file and would have likely prevented the transfer. The theory But wouldn't necessarily, because I think isn't that only one factor that's considered in transfer as danger? It's one of several factors. But then the question wouldn't be would Gamblin be liable at that point. It would be whoever made that decision. They couldn't even get to that decision because Gamblin failed to comply with the DI-67 process. And what the case law says under Johnson v. Duffy and Rizzo v. Good, under the Qualified Immunity Standard and the causal connection issue, it is enough that somebody with a substantial knowledge of a risk of serious harm to an inmate puts into action a series of events. But, see, that's where I have difficulty following your theory, because it may have been the wrong form, but he, the defendant deliberately prepared a report stating that there was a threat to this guy's life and gave it to his supervisor. And if it was on the wrong form, I guess I still find it hard to see that as being deliberately indifferent to the risk when he's reporting the risk, the very exact risk, to his superior, albeit maybe on a wrong piece of paper. But it seems hard to view that as being indifferent. And what I would ask of the Court is that the Court looks at the specific context of the case pursuant to the Qualified Immunity Standards. And in the specific context of this case, Gamblin was a trained security threat group officer who knew what the information report as far as validation was concerned. And he gave the information report concerning validation of Mr. Lucero as a member of a gang. Now, what that does when an officer boots on the ground who interviews the inmate, what that does, that does nothing as far as protective segregation. Absolutely nothing. But it isn't indifferent either. It buried in there, in the information report which said self-admission, is that Lucero said he'd get the same fate as Wathen. And as Judge Fletcher noted, it's not even apparent when that information report was submitted and where it went. And Carlson testified at deposition, which is in the record, that the information unless the person has ten points towards validation. And in this case, what Plaintiff Apelli's argument is, is no one was alerted in the system that Lucero was under this grave risk. And it's one of the gravest risks that anybody can have as an inmate in the context of a Farmer v. Brennan case. Nobody was alerted. They weren't alerted when they moved him. And again, I go back to the issue of Gamblin says he wasn't involved in the move. And if there's evidence that a jury could infer that Lucero was in grave danger because of this threat that was known to Gamblin as a security threat group officer. Well, at some point it's attenuated. What if it had happened 11 years later? I mean, you know, at some point it becomes attenuated. And at some point it becomes not deliberately indifferent. I guess I just have difficulty with how many leaps there have to be to get to the place you want to get. And why a reasonable person in Gamblin's situation would have known that it was a constitutional violation not to prepare another report. Well, as the district court found, as soon as he heard that Lucero had specifically said to the county attorneys, he said it eight times, that I'm going to die for the information that I'm giving you, the county attorneys. That's a separate incident. Had Gamblin put that information into another information report as he was required pursuant to the Arizona Department of Correction rules, there would have been an investigation done into Lucero's well-being, the protective segregation process would have started, and it would have gone up the chain of command. Then the issue would be for plaintiffs, if he was to prove that he wouldn't have been transferred and that somehow that's still all Gamblin's fault. Well, the standard is, Your Honor, that he knew of a risk of, as the Court is aware, of a substantial threat to Lucero, and he didn't take any actions within his power to do that. Well, he did take some actions. And the question is whether those actions are so deficient that he would have – that any reasonable officer in his position would have known that it was a violation of the Constitution not to do a different and additional report. And what I would turn the Court's attention to in this case is, under deposition, Ivan Bartos, who was the northern regional director of the Arizona Department of Corrections, said under the facts presented in this matter, he, Mr. Lucero, should have had the protective segregation process started, and that was never started by Gamblin. And the whole point is it's – plaintiff appellees submit to the Court that it's not an attenuated risk, that if there's nothing placed in the file by the guard that has the most contact with the inmate, that the inmate could be moved to a less secure facility and put in an open yard. And that is what happened in this matter. Now, I'm just reading from Judge Sedgwick's order, the part where he said – where I'm at the bottom of page 7 and then over the top of page 8 of Judge Sedgwick's order – that the ADC policy provides that, quote, any staff member who receives a written or verbal request from an inmate for protection or – and then he italicizes – or who becomes aware of a threat to an inmate shall immediately isolate the inmate in a safe, reasonably secure area and notify the shift commander. Now, was Carlson the shift commander? I think the – the record reflects that he was the immediate superior to Gamblin, and I am not aware of whether he was the shift commander. Specifically, the – Then Judge Sedgwick seems to think that he was not, because Judge Sedgwick says he violates the policy by – because he didn't – because he only did what he did, which was, I guess, conceded he prepared the report that goes to Carlson that then goes nowhere. Correct. And what Judge Sedgwick also said was even if the court were to take that first procedure as true, it still shows that Gamblin failed to do anything after he had heard and was present in the interview with Lucero, and he didn't file any – he didn't follow any of the DI-67 process. No. The only thing he does is fill out the information report that goes to Carlson that apparently sits, at least according to your evidence, sits in the file until all of a sudden Lucero turns up dead, and then they pretend that it's been forwarded. Correct. Now, that's your evidence, which may or may not be totally borne out. Right. And that information report was done before the interview with the two interviews with the Yuma County attorney's office. Here's a question that's a legal question that we don't have a very good answer. If we didn't have to deal with qualified immunity as a separate ingredient to this, we would have an ordinary tort case of causation and liability. Does this action lead to that action with sufficient predictability that – I don't know. We're back to Paul's graph. Okay. In order for qualified immunity to show up as an analytic matter, you only need qualified immunity when liability is found. The standard for qualified immunity is, or the forfeiture of qualified immunity is, if he is deliberately indifferent. Okay. Well, is it possible that the deliberate indifference goes to he didn't act properly? He had an obligation. He had an obligation to report to the shift commander, which I'll assume for purposes of my question, Carlson is not the shift commander. He was therefore deliberately indifferent. He knew of the threat. He knew of the regulation. He violated the regulation. And therefore, he doesn't have qualified immunity. Now, he may get off the hook because it turns out there's no liability. But if we're talking about deliberate indifference, he's deliberate indifferent. And that's the end of the qualified immunity inquiry. I don't know whether we're supposed to look at it that way or not. But I've never seen a case in which the question of attenuated causation and qualified immunity come together in the way that they have in this case. And, Your Honor, under the standard, a failure to act in an omission does con — can constitute a deliberate indifference. And in fact, the Sixth Circuit and Flint v. Kentucky Department of Corrections found that a prisoner's complaint of a risk to his life was enough to create the duty to act. And Gamblin did not do the proper duty to act. The STG, the security threat group categorization, is a totally distinct process than protective segregation. And he could have started a protective segregation packet in tandem. And with his knowledge of security threat groups and the risk to Lucero, he was aware of that substantial risk of serious harm to Lucero. Thank you, counsel. Thank you, Your Honors. Mr. Schock, you have a little bit of time remaining. Thank you, Your Honor. The main point here is that Mr. Lucero was killed in a different facility under different circumstances than Gamblin was faced with. We can sit here and hypothesize, what if SMU was an open yard? What if he wasn't safe there? It doesn't matter here because the plaintiff's cause of action arises from the murder, not from the circumstances that occurred in a different facility at a different time where the murder didn't take place. Gamblin was not a part of the subsequent change in circumstances that actually led to Lucero's murder. The cause of action here is for damages arising out of the murder. Without that, you have what used to be, you know, remember, negligence in the air. If no damage has occurred, negligence is not a consequence. Let me get a fix on the practical consequence of the question that's here in front of us. Part of this is still going forward at the moment, is that right? Yes, Your Honor. Against whom? Against the State of Arizona under a common law theory, and the all of the allegations against Officer Gamblin form a part of the cause of action against the State for these forward-looking actions. Well, but if it's just against the State and if it's under 1983, is it under 1983? No, it's not. It's a common law action. I see. Is there anything left of the 1983 action if Gamblin is dismissed now and qualified immunity? I believe Gamblin is out, and Sergeant Carlson was granted qualified immunity in the order that denied it to Gamblin. So my understanding is that the 1983 action would die if Gamblin were granted summary judgment. And let me – I know you're out of time, but there's been some discussion with opposing counsel about who was the shift commander. Is that in the record one way or the other? I don't believe there's any discussion as to identifying the shift commander per se. I do not believe that Sergeant Carlson was the shift commander. He was part of the SSU unit, Your Honor. So no – the short answer is he's not the shift commander as far as the record reveals. Thank you, counsel. And who's Robert Stewart? He isn't a deputy warden who's represented by separate counsel. Thank you. And what is his role in the events? He was the deputy warden. I believe he was involved in the transfer. Is that right? Yes. Thank you. Thank you. Now, if that's so, let me then pursue where I was going to go with this question if there's somebody else in there. I apologize. Does that mean that Gamblin's evidence will be he can be called as a witness and so on? I'm sorry?  It will be nonetheless available. He can present evidence and so on. It will be relevant to both the action against the warden and the State in the negligence case. Right. And further question, and I realize this is legally irrelevant, but I'd nonetheless be interested in the question. I know California law, if an officer in prison or a police officer or whatever is sued under 1983 and the State comes in and defends, the officer is by statute entitled to indemnification. So the officer is not on the hook for damages. Is Arizona law comparable? Yes, Your Honor. So Mr. Gamblin is not going to be on the hook for damages. The question really is whether he has to remain as a defendant in a lawsuit. He will be indemnified. It doesn't mean that he won't have a judgment entered against him. I understand that. Okay. Okay. Thank you. The case just argued is submitted, and we appreciate the helpful arguments from both of you.
judges: Graber, Fletcher, Paez